Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Fareed Kaisani, Esq.
Texas Bar No. 24104017
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| WALNUT HILL PHYSICIANS' HOSPITAL, LLC, | § § § | Case No. 17-32255-bjh7 |
| | § | |
| Debtor. | § | |

**REPLY OF MUNSCH HARDT IN SUPPORT OF
SECOND INTERIM FEE APPLICATION**

TO THE HONORABLE U.S. BANKRUPTCY JUDGE:

COMES NOW Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"), general counsel to Scott M. Seidel, the duly-appointed chapter 7 trustee (the "Trustee") for the estate (the "Estate") of Walnut Hill Physicians' Hospital, LLC (the "Debtor"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the "Bankruptcy Case"), and files this reply in support of its Second Interim Fee Application and in response to the objection thereto filed by HC-7502 Greenville Avenue, LLC (the "Landlord"), respectfully stating as follows:

1.  The Landlord suggests that the Trustee has failed to comply with his most basic duties by apparently not abandoning all assets and by apparently running this case for his benefit and that of his Munsch Hardt.  Some facts that the Court already knows but that are worth repeating:

2.      First, the Trustee was prohibited by law from abandoning the leased premises because of the large number of non-abandonable personal property located there, which the law required the Trustee to clean up. As the United States Trustee and the Attorney General of Texas made clear at virtually every hearing early on, the Trustee could not abandon the radioactive materials on site, the controlled pharmaceuticals, the body parts and human waste, the used needles, and a whole host of other things. The Trustee had <u>zero</u> dollars. Zero. Yet he was expected to clean all of this up—and he did. And, he was expected to retain patient records, which he could not abandon, and to make those available, again without any dollars. In other words, and despite the Trustee wanting to abandon everything, he simply could not.[1] This meant that he had to administer the Estate's property. Having to administer it, he did it in the best way he could, leading to benefits for everyone, as discussed below, and leading to compliments from the Court and various governmental regulators. In many ways, the Trustee, with Munsch Hardt's help, invented the model to liquidate a hospital in Chapter 7, something that was almost unheard of.[2] For the Landlord to suggest that the Trustee should have abandoned everything is knowingly ludicrous.

3.      Second, the Trustee's administration of the Estate benefited most of all . . . the Landlord. At no cost to the Landlord (but large burden and cost to the Estate), the Trustee removed all dangerous, non-abandonable, controlled, and toxic goods, he removed a semi-truck

---

[1] The Court will recall the contested hearing held on the Trustee's motion for limited abandonment and the numerous representations and findings that various property located on the Landlord's premises simply could not be abandoned.

[2] While hospitals file bankruptcy, usually it is a Chapter 11 or Chapter 9, and if there is a liquidation, usually it is post-conversion. For a fully operational hospital to simply close its doors and file Chapter 7, with radiological waste on hand, narcotics on hand, bones and human parts on hand, biological waste everywhere, patient records everywhere, all as though everyone just disappeared in a moment as in some Twilight Zone episode, is to Munsch Hardt's knowledge unprecedented. The problems were numerous, and they were large, and there was not a dollar anywhere.

worth of HIPAA material, he sold and removed thousands of items of personalty that were not the Landlord's property, that were subject to tax liens, and that were in many instances subject to contested claims of ownership—all of which enabled the Landlord to get back its building as fast as reasonably possible.  During all this time, the Landlord did not object.  In fact, the Landlord hurried the Trustee to finish doing precisely what the Landlord now objects to.  Indeed, all of what the Trustee did was done pursuant to final and non-appealable orders; *i.e.* transparently and with the Court's findings of being in the best interests of the Estate.  The Trustee understands that the Landlord was upset over the bankruptcy.  Everyone was.  But it was the Trustee who fixed the Landlord's problems for it.  And, the Landlord had gone almost fifteen (15) months' prepetition without rent.  Clearly, going a few weeks more without rent while the Trustee solved all these problems was just fine with the Landlord.  As the Landlord informed the Court:

> We want to make sure that the building is secure, and there are security guards that are posted there right now, but we are working with the Trustee on sort of parameters within which we may access our own building. . . Obviously, the pharmaceuticals, the radioactive materials on our premises, and the patient medical records, to the extent that there are any located at our physical facility are obviously a source of great concern for us and we would like to ascertain what's going to happen with those.  So, that's really kind of our focus for purposes of today. I'd like to just understand how the process is going to work on a go-forward basis, and to make sure that we are at least moving along to some sort of plan of action on how to deal with all these other issues.

Transcript June 14, 2018, docket no. 64 at 18:1-17.

      4.      As the Landlord further informed the Court, noting that it was working on the Trustee to address the myriad of issues:

> So this is not a small task in which we're endeavoring in, which is to clear this hospital out. . .  from the landlord's perspective we don't have a position with respect to necessarily the lien holders and credit bid rights, or anything else, but what we did want to make clear is that obviously we are keenly interested in getting these drugs out of the building as soon as practicable.

Transcript July 10, 2018, docket no. 228 at 13:24-14:11.

5. As the Landlord again informed the Court, during hearings concerning whether the Trustee should sell the personalty located on the premises:

> Overall my client is very happy to hear that all the issues at least at the hospital vis-a-vis the estate will be wrapped up by 11:59 p.m. on July 31st, 2017. Just some concerns that we have. Whether through the abandonment or through the sale, one would be obviously very high on our scale is what happens with this radioactive waste, and also with the biomedical waste that can't be abandoned? I'm very happy to hear Mr. Rukavina say that it will be addressed, but I would --I certainly would appreciate at least an evidentiary record indicating how that's going to be addressed, and what mechanisms are in place.

Transcript July 18, 2018, docket no. 230 at 18:4-14.

6. Not only did the Trustee solve all these problems for the Landlord, but he gave the Landlord access to the premises and cooperated with all other issues with the Landlord, such as the Landlord marketing the premises, etc.

7. Third, the Landlord alleges that "the only party to receive a material benefit from the estate is the Trustee and his counsel." Objection at ¶ 16. In addition to the Landlord being perhaps the biggest beneficiary of the Trustee's actions to-date, the following are the facts:

(i) the Trustee actually paid secured creditors and equipment lessors approximately $4.2 million and solved a world of problems for them concerning taxes and ownership/identification of property, all of which benefited unsecured creditors by reducing deficiency claims and rejection claims, and all of which was done by agreement with a large number of parties of diverse and differing interests;

(ii) the Trustee actually paid approximately $600,000 in taxes, which will benefit unsecured creditors;

(iii) the Trustee saved everyone more than $300,000 in first priority tax liens with his 505 motion and related negotiations, which will benefit unsecured creditors;

(iv) through voluntary surcharges, negotiation, and "arm twisting," the Trustee earned more than $650,000 in free and clear funds for the Estate—again, in an estate that had literally zero dollars on the Petition Date, and much of which he used to pay for removing and destroying non-abandonable property, thus freeing up the premises for the Landlord;

  (v)  through preference and avoidance litigation, the Trustee has so far obtained the voluntary waiver of more than $250,000 in 503(b)(9) administrative claims, and has recovered more than $500,000 in unencumbered funds from preference settlements, with a substantial amount more likely, both of which benefit unsecured creditors; and

  (vi)  the Trustee has rapidly and efficiently advanced this Estate and this Bankruptcy Case, almost always by agreement with various parties and creditors, to where all that remains is litigation which the Trustee believes will result in millions of dollars in recovery to unsecured creditors.

  8.  Thus, for the Landlord to allege that the Trustee and Munsch Hardt have managed this Estate for their benefit is false. For the Landlord to suggest that literally "all parties-in-interest" would be no worse off if the Trustee had just abandoned everything (which, as pointed out above, he could not) is false. And, for the Landlord to suggest that there will likely be no return to unsecured creditors is wrong. Even if the Landlord's multi-million dollar alleged administrative rent claim is allowed, that is still an unsecured claim which Munsch Hardt thinks the Landlord would like to be paid on. The only reason why there is any money in this Estate—with zero dollars to start with and with literally everything (except avoidance actions) being encumbered, is because the Trustee, with Munsch Hardt's assistance, earned that money for unsecured creditors.

  9.  Fourth, the Estate is potentially administratively insolvent only because the Landlord filed an inflated and patently unsupportable administrative claim for postpetition rent, based on a contract the Landlord itself terminated *prepetition*. What is more telling is that, after almost one year of trying to engage the Landlord in negotiations regarding the same, the Trustee was forced to file an adversary proceeding against the Landlord in late June for receiving constructively fraudulent transfers. The rent that the Landlord was charging was almost **twice** the market rate on a lease that had other terms that were well above market terms as well. In effect, the Landlord enabled the Debtor's insiders to suck money out of the Debtor with what

was really a sale lease-back, with the lease being on almost double market terms, and with the insiders saddling the Debtor with those terms. As the Trustee has alleged in his complaint, the Landlord paid $99 million for the building in 2014, even though the building was tax assessed at $10 million in 2013, and even though the Landlord itself obtained a tax assessment for the building in 2017 of $22.5 million and even though the Landlord itself carries the building on its books (according to SEC filings) at $53 million.

10. The Objection is little more than an attempt to bring pain to the Trustee and his attorneys in order to bolster litigation leverage and to punish them for exposing the truth about the lease, and for seeking to avoid the Lease and recover millions of dollars in fraudulent transfer payments. Indeed, the Court should be very weary when someone litigating against a trustee objects to his attorney's fees, especially when the objection is otherwise baseless, as it is here.

11. In the end, the Landlord does not challenge any time entries, does not point out allegedly unnecessary work, does not challenge hourly rates, or does not make any other objections that one might expect. Rather, the Landlord alleges only that the Trustee and Munsch Hardt ran this case for their benefit. That is an allegation that is not borne out by any fact and that is, frankly, offensive. This Estate is not yet fully administered. There will be times in most estates where they will be administratively insolvent, probably until close to the very end. Yet Congress has provided that the attorneys for a trustee do not need to donate their services. Yes, there is risk due to disgorgement, but the Bankruptcy Code understands the importance of period payments to professionals, especially in a large, sophisticated, and lengthy case like this. The Bankruptcy Coded provides for periodic allowance and payment even if an estate is allegedly insolvent and even if the final benefit of a professional's services cannot be decided on a final basis at that time.

12. The second objection is that the Estate is administratively insolvent. Therefore, administrative claims should not be paid. That, of course, is what potential disgorgement is for. But the Estate is not necessarily administratively insolvent, unless the Landlord's administrative claim is allowed in full, which it is highly unlikely to be. Even then, millions of dollars in remaining avoidance actions, breach of duty actions, and receivables remain. If the Landlord's administrative claim is allowed in full, it may be that there will be little if any funds to flow to unsecured creditors. But even an administrative claim is an unsecured claim, and as the largest alleged administrative claimant, what does the Landlord have to complain about? Again, would it rather that the Trustee and Munsch Hardt stop trying to recover funds for creditors? If so, then it speaks not as a legitimate creditor, but as a large defendant of the Estate.

13. If the Court grants the Application in full and orders the payment requested, and after considering the first interim fee application, Munsch Hardt would be paid approximately 70% on a current basis, subject to full disgorgement. There are enough assets remaining in the Estate, worth millions of dollars; there is enough of a cushion with respect to what Munsch Hardt has not been paid; and Munsch Hardt is large enough, has been around long enough, and is stable enough, to provide the Court with reasonable comfort that any potential future disgorgement will be paid. That should be all of the protection that the Landlord should need.

WHEREFORE, PREMISES CONSIDERED, Munsch Hardt respectfully requests that the Court overrule the Objection and grant the Application as requested, and that the Court grant Munsch Hardt such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 28th day of August, 2018.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Fareed Kaisani, Esq.
Texas Bar No. 24104017
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR MUNSCH HARDT KOPF & HARR, P.C.**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served electronically upon all parties entitled to receive CM/ECF notice on August 28, 2018, including counsel for the Landlord and counsel for the U.S. Trustee.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.